**PENNSYLVANIA POWER & LIGHT COMPANY, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 1995.

Decided Dec. 14, 1995.

Robert L. Weldon, for petitioner.

Matthew W. Tomalis, Deputy Attorney General, for respondent.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

KELLEY, Judge.

Pennsylvania Power & Light Company (PP & L) appeals from an order of the Board of Finance and Revenue which (1) affirmed a determination of the Board of Appeals for the Department of Revenue denying a Petition for Resettlement of Gross Receipts Tax (Resettlement Petition) filed by PP & L; and (2) denied PP & L's petition for review of the determination by the Board of Appeals for the Department of Revenue. We affirm.

The stipulated facts are as follows. PP & L is a public utility company subject to the provisions of the Federal Power Act[1] and the Public Utility Code.[2] PP & L is engaged in the business of producing, distributing and selling electric energy to customers.[3]

As a result of its activities during 1987, PP & L was subject to the Utilities Gross Receipts Tax imposed pursuant to Article XI of the Tax Reform Code of 1971 (Tax Reform Code), Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 8101–8104. The tax year at issue in this case is the calendar year ending December 31, 1987 for which PP & L timely filed a gross receipts tax report with the Pennsylvania Department of Revenue.

PP & L's gross receipts tax report for the year ending December 31, 1987 included: (1) taxable gross receipts of $1,809,291,999, designated as "[f]rom the sales of electric energy not including sales for resale"; (2) taxable gross receipts of $32,264,361, designated as "[f]rom the sale of current for lighting, heating or power to other utilities or municipalities for the purpose of resale"; and (3) taxable gross receipts of $6,024,321, designated as "[f]rom consumer's forfeited discounts and penalties."[4] PP & L's taxable gross receipts for the year ending December 31, 1987 thus amounted to $1,847,580,681. When this figure was multiplied by the applicable tax rate of 45 mills, PP & L's gross receipts tax for the year ending December 31, 1987 was $83,141,131.

PP & L's gross receipts tax report for the year ending December 31, 1987 was settled by the Department of Revenue on or about October 10, 1988 and was approved by the Department of the Auditor General on or about October 18, 1988. A copy of the settle-

---

1. 16 U.S.C. §§ 791a–828c. The Federal Power Act gave the Federal Power Commission jurisdiction over the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce. 16 U.S.C. § 824(a). Such federal regulation, however, only extends to those matters which are not subject to regulation by the states. *Id.* In 1977, Congress transferred the responsibilities of the Federal Power Commission to the Federal Energy Regulatory Commission (FERC). As a major electric utility, PP & L is subject to the Federal Power Act and submits detailed annual reports to the FERC. 16 U.S.C. § 825c. These annual reports are prepared pursuant to the Uniform System of Accounts of the FERC. 18 C.F.R. § 101 (1995).

2. 66 Pa.C.S. §§ 101–3316. PP & L is required to file annual financial reports with the Pennsylvania Public Utility Commission (PUC). 66 Pa.C.S. § 504; 52 Pa.Code § 57.47. PP & L is also required to keep its accounts in conformity with the Uniform System of Accounts of the FERC. 52 Pa.Code § 57.42(a).

3. The rates charged by PP & L to its intrastate, retail customers are determined pursuant to a tariff filed with and approved by the PUC. In ascertaining the amounts which a public utility may charge its customers, the PUC permits a public utility to collect sufficient revenue to recover operating and maintenance expense costs, taxes, an allowance for depreciation and a fair rate of return to investors on the "rate base." The rate base consists of, among other things, utility plant less accumulated depreciation, accumulated deferred income taxes, materials and supplies, prepayments, fuel inventory and working capital, including a consideration of cash working capital. All receipts of PP & L are commingled unless otherwise required by law, with no particular receipts being dedicated to any specific use. Neither the PUC nor the FERC requires any particular receipts to be dedicated to any specific use except in limited situations which are not relevant in the present case.

4. The $6,024,321 in taxable gross receipts which was designated as "[f]rom consumer's forfeited discounts and penalties" on PP & L's gross receipts tax report for the year ending December 31, 1987 was also included in "[g]ross receipts or sales" on PP & L's Federal Form 1120, U.S. Corporation Income Tax Return, for the year ending December 31, 1987, and on the Schedule A attached to that tax return.

ment was mailed to PP & L on October 20, 1988.

On January 17, 1989, PP & L filed a Resettlement Petition with the Board of Appeals for the Department of Revenue.[5] PP & L asserted that it had erroneously included on its tax report gross receipts which represented finance charges imposed on and received from PP & L customers for late payment of their electric bills.[6] PP & L further asserted that, since such consumer finance charges did not constitute gross receipts from the sale of electricity, they were not taxable under Article XI of the Tax Reform Code. A hearing on PP & L's Resettlement Petition was held before the Board of Appeals for the Department of Revenue on April 27, 1989.

By letter dated April 2, 1990, the Board of Finance and Revenue informed PP & L that the Department of Revenue and the Department of the Auditor General had been unable to agree on the resettlement of PP & L's gross receipts tax for the year ending December 31, 1987. As a result, the matter had been referred to the Board of Finance and Revenue for a determination of the resettlement amount. The Board of Finance and Revenue determined that PP & L's gross receipts tax for the year ending December 31, 1987 was still $83,141,131.

By letter dated April 18, 1990, the Board of Finance and Revenue then advised PP & L that the resettlement which it had issued on April 2, 1990 had been issued in error since two members of the Board of Finance and Revenue had agreed with the resettlement, two members had dissented and two members had not participated in the decision. As a result, the matter was returned to the Board of Appeals for the Department of Revenue for disposition. On June 25, 1990, the Board of Appeals for the Department of Revenue issued an order, approved by the Department of the Auditor General, in which it refused to resettle PP & L's gross receipts tax for the year ending December 31, 1987.

PP & L then filed a petition for review with the Board of Finance and Revenue pursuant to section 1103 of The Fiscal Code, 72 P.S. § 1103.[7] By order dated February 20,

---

5. PP & L filed its Resettlement Petition pursuant to section 1102 of The Fiscal Code, Act of April 9, 1929, P.L. 343, as amended, 72 P.S. § 1102. Section 1102 of The Fiscal Code provides, in pertinent part, as follows:

Within ninety (90) days after the date upon which the copy of any settlement was mailed to the party with whom or with which the settlement was made, such party or the Commonwealth of Pennsylvania may file, with the department which made it, a petition for resettlement.

6. Residential and nonresidential late charges collected by PP & L for the year ending December 31, 1987 totalled $6,024,321.

Residential late charges are charges, imposed by PP & L on residential customers, which are attributable to the failure of those customers to pay their bills on or before the due dates designated on their bills. For the year ending December 31, 1987, residential late charges were imposed by PP & L at a rate of 1.25 percent monthly on the overdue and unpaid balances of the bills. Of the total late charges collected by PP & L for the year ending December 31, 1987, $3,408,432 of those charges were residential late charges. Such late charges were designated by PP & L as "late payment charges" on the bills sent to residential customers.

Nonresidential late charges are charges, imposed by PP & L on nonresidential customers, which are attributable to the failure of those

customers to pay their bills on or before the due dates designated on their bills. For the year ending December 31, 1987, nonresidential late charges were imposed by PP & L as the difference between the "net rate" and the "gross rate" as stated in the "Payment" sections of the nonresidential rate schedules included in PP & L's tariff. Of the total late charges collected by PP & L for the year ending December 31, 1987, $2,615,889 of those charges were nonresidential late charges. Such late charges were designated by PP & L as "late payment charges" on the bills sent to nonresidential customers.

Residential and nonresidential late charges were designated on PP & L's gross receipts tax report as "[f]rom consumer's forfeited discounts and penalties." For the year ending December 31, 1987, PP & L did not make any sales to customers at a discount. The residential and nonresidential late charges were also reported to the FERC.

7. Section 1103 of The Fiscal Code provides, in pertinent part, as follows:

Within ninety days after the date of mailing of notice by the Department of Revenue, or of the Auditor General, or of the Department of State of the action taken on any petition for a resettlement filed with it, or of any resettlement made under the provisions of section one thousand one hundred five of this act, the party with whom the settlement was made or

1991, the Board of Finance and Revenue affirmed the determination of the Board of Appeals for the Department of Revenue and denied PP & L's petition for review. The Board of Finance and Revenue concluded that the consumer finance charges were such an integral component of the billing for the sale of electric energy that they should be included in taxable gross receipts unless there was a clear legislative intent to exclude them. PP & L now appeals to this court.

In this appeal, PP & L raises the sole issue of whether gross receipts from late payment charges imposed by PP & L on customers who had failed to pay their electric bills in a timely manner were properly included in the Utilities Gross Receipts Tax base pursuant to section 1101(b) of the Tax Reform Code, 72 P.S. § 8101(b).[8]

■ This court is entitled to the broadest scope of review when considering the propriety of an order of the Board of Finance and Revenue because, although this court hears such cases in its appellate jurisdiction, this court functions essentially as a trial court. *Norris v. Commonwealth*, 155 Pa. Cmwlth. 423, 625 A.2d 179 (1993). Pennsylvania Rule of Appellate Procedure 1571 authorizes this court to rule on the record made before it or on the stipulation of facts made by the parties. The stipulation of facts is binding and conclusive upon this court, but we may draw our own legal conclusions from those facts. *Norris.*

■ PP & L asserts that the Utilities Gross Receipts Tax is imposed only on the gross receipts of electric companies which are received from the "sales of electric energy." PP & L argues that such gross receipts do not include receipts from late payment

charges which are imposed on PP & L customers for failure to pay their electric bills in a timely manner. We disagree.

The rates charged by PP & L for electric service to its intrastate, retail customers are set forth in a general tariff filed with and approved by the PUC. Reproduced Record (R.) at 71a–162a. The net monthly rates for both residential and nonresidential electric service are specified in the tariff. R. at 114a–62a. Residential and nonresidential late charges are set forth on the same schedules which fix the rates for the sale of electric energy to residential and nonresidential customers. *See, e.g.,* R. at 114a–15a, 124a–26a. Since both the residential and nonresidential late charges are included in and authorized by PP & L's tariff, they must be considered to be a part of PP & L's rate structure. This court has stated that the question of how to assess late payments is essentially a rate structure question. *Kornafel v. Pennsylvania Public Utility Commission*, 114 Pa.Cmwlth. 212, 538 A.2d 146 (1988).

With respect to the rate schedules in PP & L's tariff for residential service, the "PAYMENT" provision states as follows:

> The above net rate applies when bills are paid on or before the due date specified on the bill, which is not less than 20 days from the date bill is mailed. After the due date, the Company may initiate collection procedures and a late payment charge of 1.25% per month on the then unpaid and overdue balance is applicable.

R. at 116a.[9]

Similarly, with respect to the rate schedules in PP & L's tariff for nonresidential

---

the Commonwealth of Pennsylvania may, by petition, request the Board of Finance and Revenue to review such action.

**8.** Section 1101(b) of the Tax Reform Code provides, in pertinent part, as follows:

> **(b) Electric Light, Waterpower and Hydroelectric Utilities.**—Every electric light company ... now or hereafter incorporated or organized by or under any law of this Commonwealth ... shall pay to the State Treasurer, through the Department of Revenue, a tax of forty-four mills upon each dollar of the gross receipts of the corporation ... received from:

> (1) the sales of electric energy within this State, except gross receipts derived from the sales for resale of electric energy to persons, partnerships, associations, corporations or political subdivisions subject to the tax imposed by this subsection upon gross receipts derived from such resale.

We note that the tax rate applied to PP & L's gross receipts in this case was 45 mills. Stipulation of Fact (S/F) No. 10.

**9.** We note that all three of the residential rate schedules included in PP & L's tariff contain the same language with respect to the payment of PP & L bills.

service, the "PAYMENT" provision states as follows:

> The above net rate applies when bills are paid on or before the due date specified on the bill, which is not less than 15 days from the date bill is mailed. When not so paid the gross rate applies which is the above net rate plus 5% on the first $200.00 of the then unpaid balance of the monthly bill and 2% on the remainder thereof.

R. at 130a.[10]

The additional sum which PP & L charges to and collects from its customers who do not pay their monthly bills in a timely manner is levied upon the price for which electric energy has been sold to PP & L customers. The costs which are incurred by PP & L when customers do not pay their bills in a timely manner and which are recouped by PP & L through the imposition of late charges result directly from PP & L's sales of electric energy to its customers. As such, residential and nonresidential late charges are a part of the price of electric energy sold. We believe that the gross receipts received from the higher rates imposed on late-paying customers constitute payment for the electricity sold as much as do gross receipts derived from rates applicable to timely payments.

PP & L asserts that its gross receipts from residential and nonresidential late charges are not received from the "sales of electric energy" because they are not so categorized under the Uniform System of Accounts of the FERC. We conclude that the way in which PP & L is required to keep its accounts is not relevant to how the provisions of the Tax Reform Code should be interpreted.

In *Tygart Resources, Inc. v. Commonwealth,* 134 Pa.Cmwlth. 168, 578 A.2d 86 (1990), *aff'd,* 530 Pa. 199, 607 A.2d 1074 (1992), a taxpayer who was denied tax status as a Pennsylvania S corporation argued that Pennsylvania S corporation requirements were based on federal S corporation requirements and, therefore, the Pennsylvania requirements should have been interpreted according to the Internal Revenue Code. This court refused to incorporate the Internal Revenue Code's determination of what constituted "royalties" into the Tax Reform Code for purposes of determining the taxpayer's passive investment income. *Tygart Resources.* This court stated that, while the definition of a Pennsylvania S corporation found in the Tax Reform Code required that a Pennsylvania corporation satisfy the federal S corporation standards, federal tax principles were not inextricably tied to or wholly incorporated into the Tax Reform Code. *Id.* 578 A.2d at 88. Accordingly, we held in *Tygart Resources* that the federal tax principles of the Internal Revenue Code were not to be incorporated into the Tax Reform Code. *Id.*

In the present case, we recognize that PP & L is required to keep its accounts in conformity with the Uniform System of Accounts of the FERC. 52 Pa.Code § 57.42(a). However, there is no evidence that the regulations governing the FERC were inextricably tied to or wholly incorporated into the Tax Reform Code. To the contrary, the FERC's authority over state matters has been specifically limited. Pursuant to the Federal Power Act, the FERC has jurisdiction over the transmission and sale of electric energy in interstate commerce. 16 U.S.C. § 824(a). However, such federal regulation only extends to those matters which are not subject to regulation by the states. *Id.* In this case, taxation on the "sales of electric energy" is governed by the Tax Reform Code. Accordingly, the taxability of gross receipts from residential and nonresidential late charges is not governed by the FERC regulations.[11]

---

10. PP & L's tariff includes numerous nonresidential rate schedules which vary in content. The language of this "PAYMENT" provision is representative of what appears in each schedule.

11. Similarly, taxation on the "sales of electric energy" is not governed by the Internal Revenue Service's determination that a late payment charge assessed by a public utility is deductible as interest. Importantly, we note that PP & L did not report the gross receipts from residential and nonresidential late charges as "interest" income on its Federal Form 1120, U.S. Corporation Income Tax Return. S/F No. 52; R. at 222a. Rather, PP & L reported those gross receipts as "gross receipts or sales" income. *Id.*

PP & L asserts that the rules of statutory construction require the exclusion of residential and nonresidential late payment charges from the calculation of PP & L's Utilities Gross Receipts Tax. PP & L argues that section 1101(b) of the Tax Reform Code is ambiguous because the Board of Finance and Revenue has issued inconsistent decisions interpreting this statutory provision. We disagree.

Section 1928(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1928(b), states that all provisions of a statute imposing taxes shall be strictly construed. Moreover, our Supreme Court has stated that in analyzing statutory provisions, a taxing statute must be strictly construed and any doubt or uncertainty as to the imposition of a tax must be resolved in favor of the taxpayer. *Commonwealth v. Rieck Investment Corporation*, 419 Pa. 52, 213 A.2d 277 (1965). Pursuant to section 1101(b) of the Tax Reform Code, the Utilities Gross Receipts tax is to be imposed only upon "gross receipts ... received from ... the sales of electric energy within this State." 72 P.S. § 8101(b).

In this case, section 1101(b) of the Tax Reform Code is not being loosely interpreted so as to improperly allow for the taxation of gross receipts from residential and nonresidential late charges. Rather, as we have already concluded, such charges constitute payment for electric energy sold to PP & L customers. Accordingly, these charges are appropriately taxable as gross receipts.

We note that, with respect to gross receipts from residential and nonresidential late charges for the year ending December 31, 1986, PP & L had argued before the Board of Finance and Revenue, prior to the present case, that such gross receipts should not have been included in its Utilities Gross Receipts Tax. In that instance, the Board of Finance and Revenue indicated that PP & L's taxable gross receipts for the year ending December 31, 1986 should be reduced to reflect an amount characterized by PP & L in its petition for refund as gross receipts

from finance charges imposed on PP & L customers for late payment of electric bills. Subsequently, with respect to PP & L's gross receipts from residential and nonresidential late charges for the year ending December 31, 1987, the Board of Finance and Revenue determined that such gross receipts were taxable.

With respect to the taxability of PP & L's gross receipts from residential and nonresidential late charges for the year ending December 31, 1986, the Board of Finance and Revenue provided no explanation as to why it allowed PP & L a refund. The Board of Finance and Revenue merely issued an interlocutory order in which it granted PP & L a refund for taxes imposed on gross receipts from late charges.

■■■ In contrast, with respect to the taxability of PP & L's gross receipts from residential and nonresidential late charges for the year ending December 31, 1987, PP & L clearly explained its reasons for concluding that such gross receipts were taxable. Simply because the Board of Finance and Revenue reached a different conclusion for 1987 than it did for 1986 does not mean that section 1101(b) of the Tax Reform Code is ambiguous. There is no prohibition which prevents the Board of Finance and Revenue from adopting a new position with respect to a particular issue, where warranted by the circumstances, after further thought and reflection on the issue.[12]

Accordingly, the order of the Board of Finance and Revenue is affirmed.

### ORDER

NOW, this 14th day of December, 1995, the order of the Board of Finance and Revenue, dated February 20, 1991, at No. R–13,514, is affirmed.

Unless exceptions are filed within thirty (30) days from the date of this order, judgment shall be entered in favor of the Commonwealth in the amount of $83,141,131.00, plus appropriate interest.

---

12. We note that the Commonwealth is not estopped from collecting a tax because of the failure of its officials to have collected the tax in the past. *Commonwealth v. Western Maryland Railway Company*, 377 Pa. 312, 105 A.2d 336 (1954), *cert. denied*, 348 U.S. 857, 75 S.Ct. 82, 99 L.Ed. 675 (1954).

**626** ■

PELLEGRINI, Judge, dissenting.

I respectfully dissent because the majority's holding that finance charges are subject to the Utilities Gross Receipt Tax is contrary to the language of the provision imposing the tax.

The Utilities Gross Receipt Tax is imposed pursuant to Section 1101(b) of the Tax Reform Code[1] and provides:

"Every electric light company ... shall pay to the State Treasurer, through the Department of Revenue, a tax of forty-five mills upon each dollar of the *gross receipts* of the corporation ... *received from:*

(1) *the sales of electric energy* within this State, except gross receipts derived from the sales for resale of electric energy to persons, partnerships, associations, corporations or political subdivisions subject to the tax imposed by this subdivision upon gross receipts derived from such resale; ...." 72 P.S. § 8101(b)(1). (Emphasis added.)

The issue in this case is simple: are finance charges imposed and received from Pennsylvania Power & Electric Company's customers for late payment of their electric bills subject to payment of the Utilities Gross Receipts Tax because those charges are considered "sales of electric energy"?

The majority finds that the Utilities Gross Receipt Tax has to be paid on those finance charges, because finance charges are listed in the same PUC tariff schedules that fix the rates for the sale of electricity to residential and non-residential customers. Because the imposition of the rate charges are set forth in those rate schedules and are imposed as a result directly from the sale of electricity, the majority holds that residential and non-residential charges are part of the price of electricity sold and subject to tax.

I disagree because the language imposing the tax is clear: it only imposes the tax on the sale of electricity itself and not anything directly related to the sale. To adopt the majority's reasoning, a sales tax should be imposed on finance charges that department stores collect when the balance is not paid in full. Just as the Utility Gross Receipt Tax imposes a tax on the "sale of electric energy", the sales tax[2] is imposed on the "sale of tangible personal property". If the Utility Gross Receipt Tax can be imposed on finance charges for electric bills because those charges are directly related to the sale of electricity, then that reasoning leads inescapably to the conclusion that the sales tax must be imposed on finance charges imposed on the sale of goods, because those finance charges are directly related to the sale of the goods subject to the sales tax.

Unlike the majority, I believe the plain language of Section 1101(b) of the Tax Reform Act imposes only a tax on the "sales of electric energy" and not on any funds received ancillary to the sale.

COLINS, President Judge, joins in this dissenting opinion.

---

1. Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 8101(b).

2. Section 7202(a) of the Tax Reform Act provides:

There is hereby imposed upon each separate sale at retail of tangible personal property or services, as defined herein, within this Commonwealth a tax of six per cent of the purchase price, which tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth as herein provided.